# Exhibit B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BYJU'S ALPHA, INC., | ) | Case No. 24-10140 (JTD) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| BYJU'S ALPHA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 24-50013 (JTD) |
| | ) | |
| CAMSHAFT CAPITAL FUND, LP, | ) | |
| CAMSHAFT CAPITAL ADVISORS, LLC, | ) | |
| CAMSHAFT CAPITAL MANAGEMENT, LLC, | ) | |
| INSPILEARN LLC, AND RIJU RAVINDRAN, | ) | |
| | ) | |
| Defendants. | ) | **Re: Adv. D.I. 275** |

### <u>MEMORANDUM OPINION</u>

BYJU's Alpha, Inc., ("**<u>Debtor</u>**") commenced this action asserting that the defendants fraudulently transferred over $500 million of the Debtor's assets in an attempt to defraud the Debtor's creditors.[1]  Debtor has moved for partial summary judgment (the "**<u>Motion</u>**") on Count I (actual fraudulent transfer), Count II (constructive fraudulent transfer), Count IV (breach of fiduciary duty), Count VIII (declaratory judgment), and Count X (conversion) of its Complaint.[2] Defendants Camshaft Capital Fund LP ("**<u>Camshaft Fund</u>**"), Camshaft Capital Advisors LLC ("**<u>Camshaft Advisors</u>**"), and Camshaft Capital Management LLC ("**<u>Camshaft Management</u>**") (together with Camshaft Advisors and Camshaft Management, "**<u>Camshaft</u>**"), Think and Learn

---

[1] Second Amended Complaint ("**<u>Complaint</u>**"), Adv. D.I. 151.
[2] Debtor's Motion for Partial Summary Judgment, Adv. D.I. 275.

Private Limited ( "**T&L**"), and Riju Ravindran ("**Ravindran**") (together with Camshaft and T&L, the "**Defendants**")[3] oppose the Motion.[4]

For the reasons that follow, the Motion is granted.

## FACTUAL BACKGROUND

The Debtor was incorporated in Delaware on September 27, 2021. It was formed as a special purpose financing vehicle by its parent company, T&L, to raise funds for the overseas expansion of "BYJU's."[5]  Ravindran was the Debtor's sole director from September 27, 2021, and officer from September 29, 2021.[6]  Ravindran was removed from both positions on March 3, 2023.[7]

Debtor was formed to borrow $1.2 billion in five-year term loans (the "**Term Loan**") from a consortium of lenders (the "**Lenders**"). The Term Loan, governed by a Credit and Guaranty Agreement (the "**Credit Agreement**") was executed on November 24, 2021.[8] Ravindran signed the Credit Agreement on behalf of the Debtors and its affiliates. GLAS Trust Company LLC ("**GLAS**"), the Lenders' administrative and collateral agent, also signed.[9]

Only a few months after executing the Credit Agreement, in March and April of 2022, the Debtor and its affiliates failed to satisfy certain loan covenants, which constituted defaults of

---

[3] One of the defendants in this action, Inspilearn LLC, has not filed an opposition to the Motion.  It is therefore not included within the defined term "Defendants" as used herein, though it remains a defendant in this adversary proceeding.

[4] See Camshaft Defendants' Objection to Motion, Adv. D.I. 300 ("**Camshaft Objection**"); T&L's Objection to Motion, Adv. D.I. 333 ("**T&L Objection**"); Riju Ravindran's Objection to Motion, Adv. D.I. 335 ("**Ravindran Objection**").

[5] Ravindran Ans. To Second Am. Compl., Adv. D.I. 179 ("**Ravindran SAC Ans**.") at ¶2; Declaration of Benjamin Finestone ("**Finestone Decl.**"), Adv. D.I. 277, Ex. 2 (Mar. 14 Hr'g Tr.) at 15:16-16:10. BYJU's is the trade name of a corporate conglomerate indirectly owned by T&L, based in India. *Id.* T&L is also the parent company of Inspilearn, a Delaware limited liability Company.

[6] Ravindran SAC Ans ¶¶35, 183.

[7] *Id.* at ¶39.

[8] Finestone Decl. Ex. 3 (Credit Agreement) at 166.

[9] *Id.* at 171-72.

the Term Loan.[10]  Within weeks of the defaults, the Debtor began to move funds through a series

of four transfers (together, the "**Transfers**").

The first of these occurred between April 2022 and July 2022, when the Debtor made a

series of wire transfers to Camshaft Fund (the "**First Transfer**"), a small unknown hedge fund,[11]

totaling $533 million (the "**Alpha Funds**").[12]  In exchange for the Alpha Funds, Debtor received

---

[10] Specifically, (i) on March 16, 2022, T&L failed to furnish required unaudited consolidated financial statements for Q3 FY 2021-2022 and (ii) the Debtor's then-affiliate Whitehat Education Technology Private Limited failed to guarantee the Term Loans by its deadline of April 1 2,022.  Declaration of Timothy Pohl ("**Pohl Decl.**"), Adv. D.I. 279 at ¶¶8-9, 17.

[11] An investigation by GLAS that included regulatory filings, background checks, visits to Camshaft's offices, and interviews with purported personnel and friends of Camshaft founder, William Morton ("**Morton**"), suggest that Camshaft is a sham hedge fund.  Declaration of Michael Gallo ("**Gallo Decl.**"), Adv. D.I. 278 at ¶¶4-6; Pohl Decl. ¶¶33, 35.

Camshaft Fund was founded in August 2020 by Morton, and Morton is the lone portfolio manager and "key person." Gallo Decl. ¶¶16-18; *id.* Ex. 2 (Apr. 2023 Investment Adviser Brochure at 10). Morton was a 23-year-old with no formal training, experience, or apparent qualifications in investing or money management. *Id.* ¶¶16-18; Finestone Decl. Ex. 7 (Jun. 27, 2024 Morton Dep.Tr.) 299:24-304:10. Morton also lacked any background in regulatory compliance suitable for his role as Camshaft's Chief Compliance Officer. Gallo Decl. Ex. 1 (Apr. 2023 Form ADV) at 26; *id.* Ex. 5 (Mar. 2024 Form ADV) at 24. In fact, Morton had no experience in the financial sector at all. *Id.* ¶18. The rest of the management team was misrepresented on Camshaft's websites, listing the profiles of individuals who apparently did not work for the company or did not realize they were being held at such senior positions. *See* Gallo Decl. ¶¶22-28. On state and federal regulatory filings, Camshaft Fund listed the address to a Miami IHOP. Gallo Decl. ¶7-8; Finestone Decl. Ex. 7 (Jun 27, 2024 Morton Dep. Tr.) 316:4-21, 328:3-14. More recent filings reflected Camshaft's "Current Principal Place of Business" at a single room in a coworking-style space. *Id.* ¶10. Private investigators reported that no employees were ever present during its fourteen separate visits to the office. *Id.* ¶10-14. Based on Camshaft's Form ADV disclosures and the Debtor's bank statements, it appears that approximately 90% of the Fund's assets under management were directly attributable to the Debtor's $533 million transfer. Gallo Decl. Ex. 1 (Apr. 2023 Form ADV) at 7-8, 15, 22; *id.* Ex. 5 (Mar. 2024 Form ADV) at 7-8, 15, 21; Finestone Decl. Ex. 7 (Jun. 27 2024 Morton Dep. Tr.) 337:4-9.

GLAS's investigator concluded that the hedge fund was a sham, and I agree. It is unclear why the Debtor's would choose to invest in Camshaft Fund at all. Camshaft never shared any capital account balances, financial statements, investor statements, or other performance updates or reports with the Debtor. Ravindran stated in sworn testimony that he had never heard of Camshaft Fund prior to April 2022 and did not conduct any due diligence on it. Finestone Decl. Ex. 17 (Mar. 12, 2024) Ravindran Dep. Tr.) 144:2-17, 280:17-283:16. Ravindran and Morton never spoke with one another. T&L directed Ravindran to transfer the Alpha Funds to the high-risk and unproven hedge fund, and Ravindran simply took "instructions" from T&L to "sign[] documents" without question. Finestone Dec. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 20:1-6, 24:7-13, 32:19-23, 49:3-12.

[12] Pohl Decl. ¶30; Finestone Decl Ex. 6 (SVB Account Statements) at 15, 17; Ravindran SAC Ans. ¶49.

a limited partnership interest in the Camshaft Fund (the "**LP Interest**").[13]  The First Transfer left the Debtor with approximately $131,542,108.16 in available funds across its bank and brokerage accounts.[14]  The Alpha Funds were virtually the Debtor's sole asset, as it had no other known assets, liquid or illiquid.[15]

Upon receiving the Alpha Funds, Camshaft disbursed those funds in the form of "loans" to OCI Limited ("**OCI**"), a British commercial process outsourcing (supply chain) specialist,[16] pursuant to at least three promissory notes.[17]  It was the Debtor, not Camshaft, that bore the sole risk of any default by OCI under those promissory notes.[18]  Ravindran signed side letters for each promissory note on behalf of the Debtor.[19]

The First Transfer, as well as the concurrent loans and side letters, were made without the Lenders' knowledge or approval.[20]  Ravindran and T&L concealed the First Transfer from the Lenders for months.  T&L (on whose board Ravindran sat) actively misled the Lenders into believing that the funds remained in the Debtor's bank accounts in cash or cash equivalents.  For example, in mid-March 2023, T&L furnished to GLAS, for distribution to the Lenders, unaudited quarterly financial statements for the period ended December 31, 2022, that indicated

---

[13] Finestone Decl. Ex. 8 (April 2022 Subscription Agreement); *id* Ex. 9 (July 2022 Additional Subscription Booklet).

[14] Pohl Decl. ¶30, Ravindran SAC Ans. ¶50 (estimating assets of approximately $100 million after the transfer).

[15] *See* Finestone Decl. Ex. 7 (June 27, 2024 Morton Dep. Tr.) 367:9-368:15.

[16] Finestone Decl. Ex. 10 (screenshot of OCI website)

[17] Finestone Decl. Ex. 11 (April 2022 Promissory Note); *id.* Ex. 14 (July 12, 2022 Promissory Note); *id.* Ex. 15 (July 15, 2022 Promissory Note).

[18] *Id.* Ex. 7 (June 27, 2024 Morton Dep. Tr.) 358:13-359:2 (explaining that if OCI failed to make payments on promissory notes "those losses would be taken" from the Debtor's limited partnership interest in Camshaft Fund).

[19] *Id.* Ex 12 (April 2022 Side Letter); *id.* Ex. 13 (August 2022 Amended Side Letter); *id.* Ex. 15 (July 2022 Side Letter).

[20] *Id.* Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 145:20-146:1, 146:13-147:15, 152:7-14; Ravindran SAC Ans. ¶49; Pohl Decl. ¶21.

the Debtor had an amount of Rupees equivalent to over $500 million (based on prevailing currency exchange rates) in "Cash and Bank."[21]

After the First Transfer, additional defaults occurred in September 2022.[22]  The Debtor and the Lenders continued their attempts to reach a negotiated solution, but by November 24, 2022, none of the defaults had been cured and they matured into Events of Default as defined under the amendment to the Credit Agreement.[23]  On January 6, 2023, the parties entered into a final forbearance agreement, in which the Lenders agreed to forbear from exercising remedies until February 10, 2023 and reaffirmed that a failure to cure the specified defaults would entitle the Lenders to exercise remedies.[24]

On February 8, 2023, with the defaults still uncured, counsel for the Lenders notified the parties of their intent to exercise remedies.[25]  On March 3, 2023, GLAS accelerated the loan and took control of 100% of the Common Stock as the sole shareholder.[26] Through an Action by Written Consent of the Sole Stockholder, GLAS removed Ravindran and appointed Timothy R. Pohl ("**Pohl**"), an experienced restructuring professional, as the Debtor's sole officer and director.[27]

Despite this change in control, on March 31, 2023, Ravindran transferred the Debtor's LP Interest to Inspilearn for no consideration (the "**Second Transfer**").[28]  As with the First Transfer, it was T&L who made the ultimate decision and directed the transfer, with Ravindran merely

---

[21] Finestone Decl. Ex. 18 (T&L Unaudited Quarterly Financial Statement for Period Ended December 31, 2022).
[22] Pohl Decl. ¶¶10-11.
[23] Pohl Decl. ¶ 13.
[24] Pohl Decl. ¶14; Ravindran SAC Ans. ¶¶ 92, 103; Finestone Decl. Ex. 23 (Amendment No. 7) §§ 1,6(a).
[25] Finestone Decl. Ex 24 (Feb.8 , 2023 Lenders' Email); Ravindran SAC Ans. ¶¶97-98.
[26] Pohl Decl. ¶¶18-19.
[27] *Id.* ¶¶2-4, 20.
[28] Finestone Decl. Ex. 25 (Mar. 31, 2023 Transfer Agreement) §1; *id.* Ex. 7 (June 27, 2024 Morton Dep. Tr.) 78:21-79:5, 85:1-11, 126:22-127:20.

signing documents without asking questions.[29] The Debtor received no consideration for this transfer, which was valued at that time at $540,647,109.29.[30]  The transfer was consummated and finalized on March 31, 2023 when the Debtor, Inspilearn, and Camshaft executed a Transfer Agreement and a Subscription Agreement.[31]  Following the Second Transfer, the Debtor was left with $439,905.47 in its bank accounts.[32]

On May 3, 2023, GLAS and Pohl filed suit in the Delaware Court of Chancery, seeking among other things, a declaration that Pohl had been validly appointed as the Debtor's director and officer pursuant to Delaware General Corporate Law, 8 *Del. C.* § 225.[33]  In a hearing before that Court, Ravindran's counsel acknowledged that Debtor transferred the Alpha Funds because "BYJU's felt the need to protect the cash."[34]

 The Delaware Action ultimately concluded with the Court entering an order affirming that, *inter alia*, the March 3, 2023 removal of the Debtor's then officer and director (*e.g.* Ravindran) was valid, and Pohl's appointment as sole director, CEO, and Secretary was valid.[35] Five days later, during a May 8, 2023 call, Byju Raveendran (the Debtor's founder, and self-appointed CEO, T&L's CEO, and Riju Ravindran's older brother told the Lenders' senior

---

[29] "The direction came from Think and Learn, but [Ravindran] signed the document." Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 52:4-6.

[30] Finestone Decl. Ex. 28 (Apex Statement for the Period Ended Mar. 31, 2023); Finestone Decl. Ex. 20 (Camshaft's Second Am. Interrog. Ans.) at 5, Answer to Interrog. No. 2; Finestone Decl. Ex. 7 (Jun 27, 2024 Morton Dep. Tr.) 83:13-84:18, 135:14-21.

[31] Finestone Decl. Ex. 25 (Transfer Agreement); Finestone Decl. Ex. 27 (Mar. 31, 2023 Subscription Agreement).

[32] Pohl Decl. ¶30. According to Ravindran, after the Second Fraudulent Transfer, the Debtor "didn't have anything left." Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 54:23-35.

[33] Pohl Decl. ¶ 23; *see GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 023) (the "**Delaware Action**").

[34] Finestone Decl. Ex. 30 (May 18, 2023 Delaware Action Hr'g Tr.) 34:2-35:4.

[35] Finestone Decl. Ex. 29 (Order) at 1-2; Pohl Decl. ¶¶ 36-37.

financial advisor, Stephen Spencer, in reference to the Alpha Funds, that the Debtor "doesn't have the money[.]"[36] Rather, "the money is someplace the Lenders will never find it."[37]

On May 22, 2023, the *Status Quo* Order entered by the Delaware Court of Chancery required Ravindran to "immediately" provide Pohl with "access to and exclusive control over the accounts[,] . . . documents, and information of the Company," as "necessary" for Pohl to perform [his] role as sole director and officer."[38]  After a thorough review and examination of the Debtor's bank accounts, Pohl finally determined, in July 2023, that $533 million of the Term Loan proceeds had been transferred to Camshaft Fund in April and July 2022.[39]

Soon thereafter, on September 5, 2023, GLAS sued Camshaft in state court in Miami, Florida, seeking to avoid the transfer of the Alpha Funds, among other relief.[40]

On February 1, 2024, the Debtor filed for bankruptcy (the "**Petition Date**").  That same day, Camshaft and Ravindran facilitated the further transfer of the LP Interest from Inspilearn to a "non-U.S. trust" of Inspilearn (the "**Third Transfer**").[41]

On March 5, 2024, Ravindran submitted a declaration stating that he had resigned as the manager of Inspilearn on February 14, 2024, and revealing the Alpha Funds had been transferred again to a "non-U.S. based subsidiary of BYJU's" (the "**Fourth Transfer**").[42] Ravindran refused to identify the subsidiary.

---

[36] *Id.* ¶¶ 13-14.
[37] Ravindran SAC Ans. ¶ 35; *See* Declaration of Stephen Spencer ("**Spencer Decl.**"), Adv. D.I. 280, ¶¶ 11-15.
[38] Pohl Decl. ¶ 27.
[39] Pohl Decl. ¶ 32.
[40] *Id.* ¶ 35; *GLAS Tr. Co. LLC v. Camshaft Cap. Fund, LP*, Case No. 2023-022640-CA-01 (Fla. 11th Cir. Ct. 2023).
[41] Finestone Decl. Ex. 20 (Camshaft's Second Am. Interrog. Ans.) at 4-5.
[42] Ravindran Decl. ¶¶6, 11.

On March 18, 2024, a preliminary injunction order was entered, enjoining Defendants, along with Raveendran and Divya Gokulnath (Raveendran's spouse and T&L director) "from taking any steps to spend, transfer, exchange, convert, dissipate, liquidate, or otherwise move or modify any rights" related to the Alpha Funds.[43]

On May 28, 2024, Ravindran was held in contempt for failing to comply with the Preliminary Injunction Order, which required him to "take all necessary steps to determine the location, amount, and composition of the Alpha Funds[.]."[44] To date, Ravindran has failed to respond to discovery requests and Debtor has been unable to identify which T&L subsidiary holds the funds.[45]

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## LEGAL STANDARD

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056; *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine dispute of material fact exists only if a reasonable trier of fact could enter a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). "A disputed

---

[43] Order Granting Debtor's Motion for a Preliminary Injunction, Adv. D.I. 84, (the "**Preliminary Injunction Order**").
[44] Preliminary Injunction Order at ¶2; Order on Finding of Contempt ("**Contempt Order**"), Adv. D.I. 204, at ¶1.
[45] Pohl Decl. ¶47; Finestone Decl. Ex. 37 (June 6, 2024 Email).

fact is 'material' if it would affect the outcome of the suit as determined by the substantive law."
*Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d. Cir. 1986). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex*, 477 U.S. 317, 323 (1986). When a movant's evidence demonstrates the lack of a genuine issue of material fact, the burden shifts to the opposing party to demonstrate the existence of a genuine issue for trial. *Id.*, at 327. In order to prevail, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (*citing DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (CA2 1949)). The Court's sole role is to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**DISCUSSION**

I.    **Ripeness**

A.    Request to Stay

Defendants T&L and Ravindran raise the threshold argument that the Motion is premature and that a ruling should be deferred pending the outcome of several related actions. In large part, this argument is moot, now that rulings have been issued in all but one of the other

actions since the time the parties submitted their briefing.[46]  The only action that remains

pending is the New York Action, in which a group of entities affiliated with the BYJU's

enterprise seeks, among other things, a declaration that they had not defaulted under the Loan

Agreement and damages for alleged breaches of the Loan Agreement.[47]  But Defendants' request

to stay this Motion pending the outcome of other proceedings has already been denied once,[48]

and Defendants do not cite to any change in circumstances since that ruling.  Accordingly, their

renewed request to defer a ruling on this Motion is denied.

    B.  Rule 56(d) Challenge

    All Defendants also oppose the Motion pursuant to Federal Rule of Civil Procedure 56(d),

arguing they have not had the opportunity to take any meaningful discovery of the Debtor.  Rule

56 provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it
> cannot present facts essential to justify its opposition, the court may: (1) defer
> considering the motion or deny it; (2) allow time to obtain affidavits or declarations
> or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

---

[46] Since briefing was completed, Ravindran lost his appeal in the Delaware Action.  *See Ravindran v. GLAS Trust Company LLC*, C.A. No. 2024-0488 (Del. Sup. Ct. Sept. 23, 2024) (*affm'g* the Delaware Chancery Court's ruling that GLAS had the authority to assume control over the Debtor).  Ravindran's appeals of this Court's Preliminary Injunction and Contempt Orders were also dismissed with prejudice by the District Court for failure to prosecute on December 5, 2024. *See Camshaft Capital Fund, LP v. BYJU's Alpha, Inc.*, Ca. No. 24-358-MN (consolidated) (D. Del. Dec. 5, 2024) (finding that Ravindran failed to timely file an opening brief in support of his appeals and failed to oppose the Motion to Dismiss his appeals and dismissing the appeals with prejudice). The challenged orders of the Chancery Court and this Court are thus in full effect, and Defendants' arguments about the pendency of their appeals are therefore moot.

[47] *Byju's Pte. Ltd. v. GLAS Tr. Co. LLC*, No. 652717 (N.Y. Sup. Ct. June 5, 2023) ("**New York Action**").

[48] In July of 2024, Ravindran and T&L filed an Emergency Motion to Stay Proceedings on Debtor's Motion for Partial Summary Judgment, citing both the Delaware appeals and the New York action as reason to stay the summary judgment proceedings. Adv. D.I. 290. That motion was denied. Adv. D.I. 327.

A motion pursuant to Rule 56(d) "must identify *with specificity*" three things: "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir. 1989) (emphasis added) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 139-40 (3d Cir. 1988)); *see also Radich v. Goode*, 886 F.2d 1391, 1393-94 (3d Cir. 1989). None of the declarations submitted in support of the Defendants' respective 56(d) motions satisfy these requirements.

Ravindran argues that he has not been afforded the opportunity to conduct affirmative discovery because the Court's Contempt Order has effectively ensured that, regardless of the facts, Ravindran will be found liable on all claims related to the First and Second Transfers. Ravindran cites to the provision of the Contempt Order that states he "is precluded from asserting in this Adversary Proceeding that the Alpha Funds . . . were transferred from the Debtor to Camshaft Capital Fund LP and, subsequently, from Camshaft Capital Fund LP to Inspilearn LLC, for a proper purpose."[49]  In other words, Ravindran argues, the sanction imposed in the Contempt Order made discovery futile.

As a preliminary point, I reject Ravindran's suggestion that the sanctions imposed on him because of his own conduct in this case can now be used to his advantage.  But even were that not the case, Ravindran's argument that he did not previously obtain the discovery needed because doing so would be futile directly contradicts the remainder of his argument: that there is specific discovery he requires to oppose the Motion.  If the discovery identified by Ravindran would, in fact, preclude summary judgment (as it must to be successful under Rule 56(d)), then

---

[49] Contempt Order ¶ 5.

engaging in that discovery could not be futile (thereby invalidating Ravindran's explanation for why it has not been previously obtained). Simply put, Ravindran's argument makes no sense.

T&L also seeks additional time to conduct discovery pursuant to Rule 56(d). At oral argument, T&L suggested that it could not engage in discovery because doing so would cause it to "risk…waiv[ing] [its] objection to personal jurisdiction."[50] But T&L never requested to take discovery without waiving its objection.[51] Additionally, even assuming T&L's declaration identified what evidence it hoped to gain from the Lenders and their agents with sufficient specificity, which it does not, the evidence T&L purportedly seeks to elicit would not preclude summary judgment. T&L says it intends to seek discovery concerning the restrictions on the Term Loan funds and the allowed uses of those funds so that it can establish that the Debtor's transfer of the Alpha Funds to Camshaft was permitted under the Credit Agreement. But this evidence would not preclude summary judgment because contractual compliance is not a defense to fraudulent transfer. *See, e.g.*, *In re EBC I Inc.*, 356 B.r. 631, 640 (Bankr. D. Del. 2006) ("A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties.").

Camshaft's Rule 56(d) argument is likewise unpersuasive. The declaration submitted in support of its Rule 56(d) challenge offered only vague statements about what discovery was needed and did not explain with specificity how the information sought would preclude summary judgment.[52] Further, the only explanation Camshaft offered for its failure to take the discovery it

---

[50] Oral argument transcript, Adv. D.I. 377, at 142:13-17.
[51] *Id.* at 142:18-23; 143:1-18.
[52] Declaration of Pieter Van Tol, Adv. D.I. 302.

now claims is vital is that its motion to dismiss was pending.  As I noted at oral argument,

Camshaft's arguments on this point are simply not convincing.[53]

## II.    Personal Jurisdiction (T&L)

Defendant T&L also objects to the Motion on the basis that it is not subject to this

Court's jurisdiction.

Under Bankruptcy Rule 7004, a court has personal jurisdiction over a defendant if three

requirements are met:

> (1) service of process has been made in accordance with Bankruptcy Rule 7004 or
> Civil Rule 4; (2) the court has subject matter jurisdiction under section 1334 of the
> [Judicial] Code [28 U.S.C. § 1334]; and (3) exercise of jurisdiction is consistent
> with the Constitution and the laws of the United States.

*Tribune Media Servs. v. Beatty (In re Tribune Co.)*, 418 B.R. 116, 121 (Bankr. D. Del. 2009)

(internal citations omitted).  T&L argues that the first and third requirements of this test have not

been met.

First, T&L argues that service of process has not been made in accordance with the

applicable rules.  Debtor served T&L by serving T&L's subsidiary, Inspilearn on the grounds

that the two entities are so closely related that Inspilearn is effectively T&L's alter ego.[54]  Debtor

effectuated service in four ways: (1) personal service; (2) first-class mail; (3) email directed to

T&L's current counsel and board members; and (4) mail to T&L's registered address in India.[55]

---

[53] The Court rejected counsel's argument that the pending motion to dismiss is a valid excuse for failing
to conduct discovery. Oral Argument Transcript, Adv. 377 at 30:8-12.  Counsel also argued that it was "in
good faith" satisfying the Debtor's discovery, which was "a massive undertaking" that prevented
Camshaft from taking their own offensive discovery. The Court dismissed this as well, noting that Mr.
Morton fled the country to avoid doing discovery and the court held him in contempt.
[54] *See* Summons and Notice of Pretrial Conference ("**Summons**"), Adv. D.I. 152; *see also* Affidavit of
Corporate Service, Adv. D.I. 160.
[55] *See id.*; Complaint, Ex. 1, at § 10.1.

T&L does not contest that this service occurred.  Rather, it disputes that any of these methods of service is sufficient to satisfy both the 1965 Hauge Convention on Service Abroad (the "**Hague Convention**") and Federal Rule of Civil Procedure 4(h).[56]  Specifically, T&L argues that under the Hague Convention, the Debtor was required to serve T&L in India, and that domestic service upon T&L's Delaware subsidiary Inspilearn was insufficient "substitute service" to satisfy Rule 4(h)(1) because Inspilearn is not a general agent of T&L.

As I explained in my ruling on T&L's motion to dismiss (Adv. D.I. 382), the Hague Convention does not apply where service on a domestic subsidiary is valid and complete under both state law and the Due Process Clause of the Fourteenth Amendment.  *See also Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 697, 707 (1988) (affirming lower court ruling that under state law service on a foreign defendant could be effectuated through its domestic subsidiary where the parent and the subsidiary are "so closely related that [the subsidiary] is [the parent]'s agent for service of process as a matter of law").  Under Delaware law, service on a subsidiary will confer jurisdiction over the parent if the subsidiary is found to be either the alter ego or the agent of the parent.  *See Akzona, Inc. v. E. I. Du Pont de Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984) ("Service on a subsidiary does not confer jurisdiction over the parent where separate corporate identities are maintained, unless the subsidiary is found to be either the alter ego or the agent of the parent.").  Here, there is sufficient evidence for me to conclude that Inspilearn is T&L's alter ego.

"In order to find that a subsidiary is the alter ego or instrumentality of the parent, the Plaintiff must prove control by the parent to such a degree that the subsidiary has become its mere instrumentality."  *Id.* (internal quotation and citation omitted).  "Whether a subsidiary is the

---

[56] In a bankruptcy adversary proceeding, service of process is governed by Bankruptcy Rule 7004, which incorporates the methods authorized by FRCP 4(e)-(j).  *See* Fed. R. Bankr. P. 7004(a).

agent of the parent involves a determination that the separate corporate identities of the subsidiary and parent are a fiction and that the subsidiary is, in fact, being operated as a department of the parent." *Id.* "The parent must have actual, participatory and total control of the subsidiary." *Id.*[57] T&L argues that the Debtor has not put forth sufficient evidence to satisfy this standard here. I disagree.

Debtor has offered an abundance of evidence that T&L has "actual, participatory, and total control" over Inspilearn, including that:

- T&L employed only a single person -- Riju Ravindran, the brother of T&L founder Byju Raveendran – at both Debtor and Inspilearn, which were both non-operating companies with no business and no other advisors[58]

- T&L controlled all corporate functions of Debtor and Inspilearn and neither subsidiary maintained its own books and records[59]

- T&L made all decisions on behalf of the Debtor and Inspilearn, as evidenced by Riju Ravindran's testimony that as sole officer of the

---

[57] Courts have acknowledged in subsequent opinions that the standard applied by the *Akzona* court is more akin to that applicable for determining alter ego status than for determining the existence of an agency relationship. See *British Telcoms. PLC v. IAC/InteractiveCorp*, 356 F. Supp. 3d 405, 412 (D. Del. 2019) ("The analysis conducted in Akzona has been recognized by subsequent courts in this district (either explicitly or implicitly) as being more akin to an alter ego analysis than to a conventional agency analysis. *See Upjohn Co. v. Syntro Corp.*, No. CIV. A. 89-107, 1990 U.S. Dist. LEXIS 11512, 1990 WL 79232, at *4 (D. Del. Mar. 9, 1990) (stating that the court in *Akzona* "concluded that the record was insufficient to support a finding that the subsidiary was the alter ago of the parent"); *Sears, Roebuck & Co. v. Sears*, 744 F. Supp. 1297, 1305-06 (D. Del. 1990) (finding that "[t]he Court in *Akzona* . . . did not distinguish the agency and alter-ego theories[;] [h]owever, it did find that absent *total* control of the subsidiary . . . the presence of the subsidiary could not be imputed to the parent for jurisdictional purposes")). However, because (1) the parties both relied on *Akzona*; (2) the parties here made no attempt to discuss what is required under Delaware law to establish an agency, instead relying on either cases discussing the agency law of other states or Delaware alter ego law, and (3) because I find the evidence satisfies the higher burden of establishing alter ego, I find *Akzona* to be instructive here.
[58] Ravindran SAC Ans., at ¶¶35-36. Ravindran was the "sole governor" of Inspilearn until he resigned in February 2024. Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 32:24-33:1.
[59] Finestone Decl. Ex. 17 (Ravindran Dep. Tr.) 246:17-247:4; Finestone Decl. Ex. 32 (First Day Hr'g Tr.) 37:8-11 ("We do note that the debtor's declaration indicates that they do not have access presently to the books and records and, accordingly, they don't know who their creditors are."). *See also* First Day Declaration at ¶7 (noting that T&L had possession of books and records for the Debtor).

Debtor and Inspilearn he did not "ever make a decision for [himself] over BYJU's Alpha" – "[i]t was always with the parent"[60]

- T&L directed Riju Ravindran to transfer funds from Debtor to Inspilearn and then to its non-US offshore trust [61]

- T&L's founder, CEO, and director, Byju Raveendran, admitted to directing the movement of money from the Debtor to "protect the money" from the Lenders, stating that he hid the money "someplace the Lenders will never find it"[62]

T&L has not introduced any evidence that might call these facts into question or otherwise contradict the conclusion that T&L exercised total control over Inspilearn. Accordingly, I find the Debtor has established that Inspilearn is T&L's alter ego as a matter of law. As such, service on Inspilearn is sufficient under Delaware law to effectuate service on T&L.

T&L next argues that the personal jurisdiction is not appropriate here because the constitutional requirements for jurisdiction have not been met. To satisfy constitutional due process, a defendant must have "purposefully established 'minimum contacts' in the forum," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice,'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). The minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation, *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977), such that the defendant has fair warning it may be subject to suit in that forum. *Marten*, 499 F.3d at 296. A foreign corporation is entitled to due process-based personal jurisdiction protections to the same extent

---

[60] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 20:1-6, 42:7-13, 39:19-23, 49:3-12; Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 48L 15-49:11 (Ravindran viewed the transfers as "all within the BYJU's enterprise.").
[61] Finestone Decl. Ex. 35 (Mar. 5, 2024 Ravindran Decl.) ¶6; Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) at 51:8-52:6 ("Q. The direction [to sign documents approving the transfer from the Debtor to Inspilearn] came from Think and Learn, but you signed the documents, correct? A. Correct, sir.").
[62] Spencer Decl. ¶13-14.

as a United States citizen. *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F. 4th 226, 223 (5th Cir. 2022).

A federal court must have one of two forms of personal jurisdiction to comport with these principles: either general jurisdiction or specific jurisdiction. *See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 (1984)).[63] Specific jurisdiction exists when the cause of action arises from the defendant's forum related activities. *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016). "In contrast, general jurisdiction does not require [the d]efendant's connections be related to the particular cause of action, but that [d]efendants have continuous or systematic contacts with the forum state." *Gurmessa v. Genocide Prevention in Eth., Inc.*, Civ. Action No. 21-869-RGA, 2023 U.S. Dist. LEXIS 54563, at *4-5 (D. Del. Mar. 29, 2023). In bankruptcy cases, the relevant forum for purposes of personal jurisdiction is the United States in general, not the state in which the bankruptcy court sits. See *Zazzali v. Swenson (In re DBSI, Inc.)*, 451 B.R. 373, 376 (Bankr. D. Del. 2011) ("'Where Congress has spoken by authorizing nationwide service of process, . . . the jurisdiction of a federal court need not be confined by the defendant's contact with the state in which the federal court sits.'") (quoting *Pinker,* 292 F.3d at 369) (alteration in original); Fed. R. Bankr. P. 7004(d).

T&L raises three arguments related to personal jurisdiction: (1) that the Court lacks general personal jurisdiction over T&L because it is a foreign entity with no business operations in the United States; (2) that the Court lacks specific jurisdiction over T&L because the contacts relied upon by Debtor are not T&L's contacts, but are contacts of Inspilearn and Ravindran; and

---

[63] Because the bankruptcy rules provide the statutory basis for personal jurisdiction, "the Court need not look to the Delaware long arm-statute, or the case law interpreting it, to determine whether it has personal jurisdiction." *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 317 (Bankr. D. Del. 2005).

(3) that even if minimum contacts were established, an exercise of personal jurisdiction over T&L would be unreasonable.

Debtor responds that this Court could exercise either general or specific jurisdiction over T&L.   General jurisdiction exists, Debtor argues, because the Court has jurisdiction over T&L's subsidiary Inspilearn, which is T&L's alter ego.  Specific jurisdiction exists, according to Debtor, because T&L's creation of U.S. entities for the purpose of engaging in business in the U.S., which business is now the subject of this litigation, amounts to conduct purposefully directed at this forum.

With respect to general jurisdiction, as noted in my ruling on T&L's motion to dismiss (Adv. D.I. 382), at least one court has observed that a finding of general jurisdiction based on an alter ego theory is perhaps at odds with the Supreme Court's admonition that general jurisdiction over a corporation only comports with the constitutional limits of due process when the forum is one in which the corporation is "fairly regarded as at home."  *Daimler AG v. Bauman*, 571 U.S. 117, 136-37 (2014).  However, I need not rule on that issue because Debtor has put forth sufficient evidence to establish specific jurisdiction over T&L.

Specific jurisdiction exists where the defendant has (1) purposefully directed its activities at the forum; (2) the litigation arises out of or relates to at least one of those activities; and (3) the exercise of jurisdiction otherwise comports with fair play and substantial justice.  *Weiser Law Firm, P.C. v. Hartleib*, No. 23-1889, 2024 U.S. App. LEXIS 32691, at *6-7 (3d Cir. Dec. 26, 2024).  Here, Debtor has submitted the following evidence regarding T&L's activities directed at the forum:

- T&L created the Debtor, a Delaware corporation with its principal place of business in the State of Illinois.[64]

---

[64] Finestone Decl. Ex. 1 (Certificate of Incorporation).

- T&L created Inspilearn, a wholly owned subsidiary which is a Delaware limited liability company.[65]

- T&L used the Debtor, a special purpose financing vehicle, as the borrower under a Credit and Guaranty Agreement for the Term Loan.[66]

- T&L served as a guarantor for the Term Loan.[67]

- T&L offered three of its Delaware subsidiaries as guarantors for the Term Loan.[68]

- T&L engaged two U.S. banks as Joint Lead Arrangers and Joint Bookrunners for its efforts of borrowing money primarily from the U.S. capital market.[69]

- T&L submitted itself to the jurisdiction of the U.S. District Court for the Southern District of New York in "any action or proceeding arising out of or relating to" the Credit Agreement.[70]

- T&L instructed the Debtor, through Ravindran as sole director, to transfer over $533 million of the loan proceeds to Camshaft Fund in exchange for the LP Interest.[71]

- T&L instructed Ravindran to transfer the LP Interest to Inspilearn after Ravindran had been removed as director and officer of the Debtor.[72] T&L also communicated directly with Camshaft Fund about the transfer and provided AML materials to Camshaft's then-fund administrator.[73]

---

[65] Ravindran SAC Ans. at ¶ 36.

[66] Finestone Decl. Ex. 3 (Credit and Guaranty Agreement); Ravindran SAC Ans. at ¶2; Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) at 15:16-16:10.

[67] Finestone Decl. Ex. 3 (Credit and Guaranty Agreement) at 37.

[68] *Id.*, at 37.

[69] *Id.* at 1.

[70] *Id.*, at 148.

[71] Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) 43:2-5 ("Q. You signed the documents for BYJU's Alpha to make the investment into Camshaft, did you not? A. Yes. From the instructions from the parent company, sir."), 49:3-12 ("Q. You were just taking direction from the parent though, correct? A. Yes, sir.").

[72] Finestone Decl. Ex. 2 (Mar. 14 Hr'g Tr.) at 51:8-52:6 ("Q. The direction [to sign documents approving the transfer from the Debtor to Inspilearn] came from Think and Learn, but you signed the documents, correct? A. Correct, sir."); Finestone Decl. Ex. 27 (Mar. 31, 2023 Subscription Agreement); Finestone Decl. 25 (Transfer Agreement).

[73] Finestone Decl. Ex. 26 (Mar. 6, 2024 Kishore Email) (email from BYJU's Chief Strategy Officer to William Morton requesting to resume the process of transferring Byju's Alpha Inc.'s account to Inspilearn; *id.* (additional emails in Exhibit 26 between Kishore, Morton, Raveendran, and employees at Apex discuss exchanging AML and KYC documents).

- The transfer agreement and subscription agreement were governed by U.S. law.[74]

T&L does not dispute that these actions demonstrate that it purposefully directed its activities at the forum or that the litigation "arises out of" or "relates to" these activities. Instead, T&L simply reiterates its objection to Debtor's reliance on actions taken by Inspilearn or Ravindran, asserting that T&L did not appoint either as its agent. But no finding regarding agency is needed. As discussed above, Debtor has submitted sufficient evidence to establish that Inspilearn was T&L's alter ego and exercised total control over both Inspilearn and Ravindran. This, in addition to the fact that the activities relied on closely relate to the claims asserted, leads me to conclude that the minimum contacts necessary to support the exercise of specific jurisdiction over T&L are present here. Nevertheless, for jurisdiction to be proper, I must also determine whether the exercise of jurisdiction over T&L would otherwise comport with fair play and substantial justice. T&L disputes that this final requirement for jurisdiction is satisfied, arguing that the Court should refrain from exercising specific jurisdiction here because doing so would be unreasonable. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (exercise of personal jurisdiction must be "reasonable under the circumstances of the particular case") (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

Where the plaintiff makes a *prima facie* showing of minimum contacts, the burden then shifts to defendants to "'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 321 (Bankr. D. Del. 2005) (quoting *Grand Entm't Group v. Star Media Sales*, 988 F.2d 476, 483 (3d Cir. 1993)). "The burden on a defendant who

---

[74] Finestone Decl. Ex. 27 (Mar. 31, 2023 Subscription Agreement); Finestone Decl. 25 (Transfer Agreement).

wishes to show an absence of fairness or lack of substantial justice is heavy." *Id.* In deciding whether a defendant has met this burden, courts consider the following factors: (1) the burden on defendants of litigating in the United States; (2) the interest of the United States in adjudicating the dispute; (3) the plaintiff's interest in obtaining the relief sought; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Id.*

T&L contends that requiring it to defend this action in Delaware would impose an exorbitant and unreasonable financial burden on it because all of its witnesses are located in India or Dubai and it is already being forced to expend millions of dollars litigating with the Debtor in state court in Delaware and New York, as well as litigating with GLAS in the action it commenced against T&L in India. I am not persuaded.

While T&L has perhaps established that litigating in the United States is inconvenient, it has not demonstrated that the exercise of jurisdiction over it would be unreasonable. "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033 (1987). Considering the extensive evidence suggesting T&L's creation of a U.S. subsidiary which was then used to perpetrate a fraud, I find that under the circumstances of this case, the exercise of jurisdiction over T&L is reasonable.

Having disposed of the Defendants' threshold arguments, I will now consider the substance of Debtor's Motion.

III.    <u>**Actual Fraudulent Transfer (Count I) against Camshaft**</u>

Debtor first moves for summary judgment against Camshaft on its claim in Count I for actual fraudulent transfer with respect to the First Transfer.

A.  <u>Section 550</u>

Camshaft first argues that Debtor cannot recover from Camshaft because it is not an initial transferee or other qualifying entity under Section 550 of the Code but is instead a "mere conduit."

Section 550 provides that a trustee or debtor in possession may recover property from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee or such initial transferee."  11 U.S.C. § 550(a).  The term "initial transferee" is not defined in the Bankruptcy Code, but courts in the Third Circuit have adopted the "dominion and control" or "conduit" test as a "defense to avoidance . . . for those entities which are 'mere conduits' of the avoided transfers." *In re Parcel Consultants*, 287 B.R. 41, 46-47 (Bankr. D.N.J. 1992).  To be a 'mere conduit,' a defendant must establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use." *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 103 (Bankr. D. Del. 2006) (internal quotation and citations omitted).

In support of its "mere conduit" defense, Camshaft makes the conclusory argument that the Debtor did not give Camshaft dominion and control over the Alpha Funds.  However, it cites to nothing in support of this position.  Instead, it simply contends that Debtor's proposed interpretation of the documents that govern the Loan (suggesting that Camshaft did have control over the funds) is incorrect, and that additional discovery is needed.  As discussed above, the time for Camshaft to take discovery has passed.  The "mere conduit" defense is an affirmative

defense for which Camshaft has the burden of proof. *Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155, 160 (Bankr. D. Del. 2011). It has not met this burden here.

    B. <u>Good Faith</u>

Camshaft next argues that it accepted the Alpha Funds in good faith consistent with Section 548(c) of the Code, thereby precluding Debtor from establishing the transfer was fraudulent as against Camshaft. *See* 11 U.S.C. § 548(c) (providing that a party that receives a fraudulent conveyance "that takes for value and in good faith has a lien on ... any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer or obligation").

Camshaft argues that it satisfies the requirements for this defense because the evidence shows that Camshaft (1) was unaware of the Credit Agreement (or any alleged default) at the time of the transfers; (2) had no actual knowledge of any fraudulent purpose for the transfers; and (3) performed extensive due diligence on the Debtor and the BYJU's group prior to the transfers.[75]

Debtor responds that Camshaft cannot establish its good faith because even if one accepted Camshaft's assertion that it lacked actual knowledge of a fraudulent purpose, the evidence conclusively demonstrates that Camshaft was on inquiry notice regarding the Debtor's fraudulent intent. I agree.

As Camshaft acknowledges in its objection,

> In analyzing the issue of good faith, a court must consider whether the transferee had actual knowledge of the debtor's fraudulent purpose in making the transfers or had knowledge of facts or circumstances that would have induced an ordinarily prudent person to make inquiry and if the inquiry, if made with reasonable

---

[75] Morton Decl., Adv. D.I. 301.

diligence, would have led to the discovery of the debtor's fraudulent purpose.

Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a diligent investigation requirement. A transferee cannot meet its burden of a diligent inquiry by intentionally remaining willfully ignorant of facts that would cause it to be on notice. The willful blindness inquiry focuses on whether an individual took deliberate action to avoid learning of a fact after there was a high probability that the fact was true. A transferee may not put on "blinders" prior to entering into transactions with the debtor where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency.

*Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 511 (Bankr. D. Del. 2022) (citation omitted).

Here, there were numerous red flags that should have led Camshaft to discover the Debtor's fraudulent purpose. These include that: 1) the transaction was exponentially larger than that which a fund as small and new as Camshaft would typically handle;[76] (2) Camshaft had virtually no downside exposure;[77] (3) Camshaft received excessive fees upfront;[78] and (4) the terms of the deal did not line up with its economic substance.[79] In the face of this evidence

---

[76] *See* Gallo Decl. Ex. 1 (Apr. 2023 Form ADV) at 7-8, 15, 22 (disclosing approximately $595,845,395 in AUM); Gallo Decl. Ex. 5 (Mar. 2024 Form ADV) at 7-8, 15, 21 (disclosing approximately $581,052,119 in AUM); Finestone Decl. Ex. 7 (Jun. 27, 2024 Morton Dep. Tr.) 337:4-9 (conceding that other limited partners comprised less than $10 million of Camshaft's NAV at the time the Debtor made its initial subscription in Camshaft Fund).

[77] *See* Finestone Decl. Ex. 7 (Morton Dep. Tr.) 358:13-359:20.

[78] *See* Finestone Decl. Ex. 11 (April 2022 Promissory Note) at 1; *id.* Ex. 7 (Jun. 27, 2024 Morton Dep. Tr.) 354:24-355:19; *id.* Ex. 12 (April 2022 Side Letter) at 1. Of the $18 million of prepaid interest on the April 2022 Promissory Note, Camshaft Fund would immediately receive $9 million. Finestone Decl. Ex. 15 (July 2022 Side Letter) at 2. Of the $24.1875 million of prepaid interest on the July 12, 2022 Promissory Note, Camshaft Fund would immediately receive $1.6675 million. On July 15, 2022, OCI executed yet another promissory note to Camshaft Fund in a principal amount of $16.52 million, of which $1.42485 million was prepaid interest. Finestone Decl. Ex. 16 (July 15, 2022 Promissory Note) at 1.

[79] *See* Finestone Decl., Ex. 7 (Morton Dep. Tr.) 179:24-180:17, 242:23-243:3; *id.* at 181:11-15 (admitting that OCI "crossed out what they were going to repay with money they['d] spent on liabilities related to BYJU's," which is "consistent with the investment structure"); *id.* at 181:16-182:5 (explaining that OCI offsetting amounts it spent on good and services for the "BYJU's enterprise" with the money lent was "why the investments in us happened"); Declaration of William Morton ("**Morton Decl.**"), Adv. D.I. 301, ¶ 5 and Ex. C (explaining purpose of transaction); Finestone Decl. Ex. 7 (Morton Dep. Tr.) 358:13-359:21.

suggesting an improper purpose, Camshaft's evidence – even when viewed in the light most favorable to it – does not create a genuine issue of material fact as it would not be sufficient to enable a jury to find in its favor. *Clark v. Modern Group Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) ("Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (non-moving party must come forward with "specific facts" showing a genuine issue for trial; evidence that merely raises some "metaphysical doubt as to the material facts" is insufficient to satisfy the non-moving party's burden).

Like the mere conduit defense, the burden with respect to the good faith defense rests solely on Camshaft. *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 391 (E.D. Pa. 2013) ("'Good faith' is an affirmative defense for which the transferee bears the burden of proof."). Camshaft has failed to meet that burden here.

C. Merits of Actual Fraudulent Transfer Claim against Camshaft

In Count I of the Complaint, Debtor seeks to recover the funds transferred as actual fraudulent transfers pursuant to both state and federal law. To prevail, Debtor "must prove that the debtor made these transfers with actual intent to hinder, delay, or defraud its creditors." *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, 2023 Bankr. LEXIS 2584, at *22 (Bankr. D. Del. Oct. 19, 2023). "These requirements are in the disjunctive, such that 'any one of the three requisite states of mind . . is sufficient to establish the intent element.'" *Id.* (alterations in original).

A plaintiff may establish intent in an actual fraudulent transfer case in one of two ways: (1) through direct evidence; or (2) through circumstantial evidence. *Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt PLC)*, 2024 Bankr. LEXIS 104, at \*123 (Bankr. D. Del. Jan. 18, 2024). To demonstrate fraudulent intent in the absence of direct evidence, claimants typically rely on "'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Kirschner v. Large S'holders (In re Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 160 (2d Cir. 2021).

The badges of fraud that courts often consider include: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control, or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).[80] "The presence or absence of any single badge of fraud is not conclusive," and "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (internal citations omitted). Moreover, while the existence of a single badge of fraud "may cast suspicion of the transferor's intent," *In re Fedders* 11 *N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009), "a confluence of several badges of fraud in one transaction [ ] generally provides

---

[80] States that have enacted the Uniform Fraudulent Transfers Act, including Delaware and Florida, have codified the badges of fraud. *See* 6 *Del. C.* § 1304(b) (codifying the "badges of fraud"); Fla. Stat. § 726.105(2) (same).

conclusive evidence of an actual intent to defraud." *Merrill Lynch Business Fin. Srvs., Inc. v. Kupperman*, 441 F. App'x 938, 941 (3d Cir. 2011) (citations omitted).

Here, Debtor asserts that the evidence demonstrates that five badges of fraud were present with respect to the First Transfer, thereby establishing the requisite intent to hinder, delay, or defraud Debtor's creditors (namely, the Lenders). Specifically, Debtor points to the following:

> • **The fact of the transfer itself was concealed.** Until the Debtor's current management uncovered, through the Debtor's bank account records in July 2023, the transfers of the Alpha Funds to Camshaft Fund, the fact those transfers had been made was hidden for nearly 16 months.[81]

> • **The Debtor transferred "substantially all" of its assets.** Debtor transferred $533 million—more than 80% of its assets to Camshaft Fund.[82]

> • **The Alpha Funds were concealed.** The Debtor's former management actively concealed the Camshaft Fund transfer, disclosing post-transfer that the Debtor still possessed over $500 million in "Cash and Bank."[83] Camshaft has concealed the location of the Alpha Funds in several ways, including by disregarding this Court's discovery orders, even in the face of contempt sanctions and a warrant for civil confinement.

> • **The Debtor was insolvent post-transfer.** The Debtor had over $1 billion in liabilities against approximately $131 million in total assets after the Camshaft Fund "investments," with no ability to generate revenue.[84]

> • **The Debtor made the transfer shortly after incurring substantial debt.** The Debtor began making the Camshaft Fund transfers within six months of entering into the Credit Agreement, on the heels of two defaults and one limited waiver arrangement.[85]

---

[81] Debtor's Opening Brief, ¶ 53.
[82] *Id.* ¶¶ 13-14; Pohl Decl. ¶ 30
[83] *See id.* ¶¶ 15-19; *Merrill Lynch*, 441 F. App'x at 941 (as here, the transferor had been "repeatedly submitting false statements to cover up fraudulent conduct").
[84] *See id.* ¶¶ 11, 13.
[85] *See id.* ¶¶ 11, 13; Pohl Decl. ¶ 9.

Camshaft responds by offering alternative explanations for the facts that the Debtor suggests evince a fraudulent intent. For example, in response to Debtor's assertion that the First Transfer was concealed, Camshaft argues that Debtor has not been able to point to anything that would give rise to an obligation by Debtor to notify the Lenders of the transfer or otherwise disclose it. With respect to the fact that Debtor transferred substantially all of its assets and that the transfer occurred shortly after the Debtor incurred substantial debt, Camshaft argues this does not suggest fraud because, consistent with the terms of the Credit Agreement, facilitating the movement of funds to BYJU's entities was the entire purpose of the Loan. But Camshaft points to no evidence in support of these theories. Argument alone is insufficient to defeat summary judgment.

With respect to the remaining badges of fraud, Camshaft disputes the Debtor's interpretation of the evidence it put forth, but it again offers no contrary evidence of its own. For example, on the issue of the concealment of the funds, Camshaft argues that Debtor's suggestion that one can infer an improper motive from the fact that the financial statements produced by T&L include an entry reflecting the Debtor as having over $500 million in "Cash and Bank" should not be given any weight because there is no evidence in the record regarding how either the Lenders or T&L interpreted that entry. Camshaft argues that the "Cash and Bank" entry could actually mean that T&L believed that Debtor had continuing access to the Alpha Funds even after they were transferred; an interpretation that would contradict Debtor's claim of insolvency as a result of the transfer. But it was Camshaft's obligation to obtain this evidence, not the Debtor's. Camshaft could have deposed T&L and gotten its explanation for this entry, but it did not. Its failure to do so does not create an issue of fact.

Camshaft does cite to the testimony of Morton, which it suggests offers "several, legitimate corporate purposes" for the First Transfer.  Specifically, Camshaft argues that its evidence establishes that the First Transfer was unrelated to the defaults because it shows that (1) Debtor was discussing a deal with the financial markets well before the first default occurred; and (2) that in those negotiations there was no discussion of any defaults under the Credit Agreement.  But, as discussed above in connection with Camshaft's good faith defense, even viewing this testimony in the light most favorable to Camshaft, this evidence does not create a genuine issue of material fact.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986) (emphasis in original).

Considering all the evidence before me, I find there to be no genuine issue of material fact as to the Debtor's claim that the First Transfer is an actual fraudulent transfer as to Camshaft.

For these reasons, the Motion with respect to Count I (as to Camshaft) is granted.

## IV.    Actual Fraudulent Transfer (Count I) against Inspilearn and T&L

Debtor next moves for summary judgment against Inspilearn and T&L, jointly and severally, on Count I with respect to the Second Transfer (the transfer of the LP Interest to Inspilearn). Debtor seeks to hold both Inspilearn and T&L liable for this transfer on the theory that Inspilearn was under the common control of T&L and Ravindran at the time of the transfer, in March 2023.

Defendant Inspilearn has neither entered an appearance in this case nor filed an opposition to the Motion.  Accordingly, summary judgment against Inspilearn is granted by default.

T&L opposes the Motion with respect to Count I only on the basis that T&L is not a proper party under Section 550 of the Code because it did not make or receive any of the transfers at issue.  Debtor does not dispute that T&L was neither a transferee nor a transferor of any transfer but argues that its claim against T&L is nevertheless proper because T&L is the entity for whose benefit the Second Transfer was made.  In other words, it was a "transfer beneficiary."  *See* 11 U.S.C. § 550(a)(1) (allowing plaintiff to recover from an initial transferee as well as any "entity for whose benefit such transfer was made").

In response, T&L argues that it cannot be the beneficiary of the Second Transfer because it is the subsequent transferee of the First Transfer.  In support of this position, T&L cites *Sklar v. Susquehanna Bank (In re Glob. Prot. USA, Inc.)*, 546 B.R. 586, 621 (Bankr. D.N.J. 2016) (holding that "a subsequent transferee cannot also be an entity for whose benefit the transfer was made.").

Debtor replies that it is not seeking to hold T&L liable as both subsequent transferee of the First Transfer and transfer beneficiary with respect to the Second Transfer.  Rather, it is not seeking to recover from T&L as to the First Transfer at all; only the Second Transfer.[86]  Debtor contends that since T&L makes no argument as to why it should not be considered the transfer beneficiary of the Second Transfer, its argument pursuant to Section 550 should be rejected.  I agree.

---

[86] Debtor's Omnibus Reply to T&L's and Ravindran's Objections to Motion, Adv. D.I. 346 at 14.

A plaintiff may recover from a "transfer beneficiary" if it (i) actually received a benefit, (ii) that is quantifiable, and (iii) is accessible to the beneficiary. *See In re McCook Metals, L.L.C.*, 319 B.R. 570, 590 (N.D. Ill. 2005) (holding majority owner, manager, and chairman of limited liability company liable for transfers to the limited liability company); *see also In re Samson Resources Corp.*, 2022 WL 3135288, at *7-8 (Bankr. D. Del. Aug. 4, 2022) (adopting the *McCook Metals* test). Debtor argues that T&L satisfies the *McCook* test as the transfer beneficiary of the Second Transfer, pointing first to the fact that T&L owns 100% of the membership interests in Inspilearn.[87] Thus, although Inspilearn formally received the LP Interest, T&L received the entire economic benefit of the transfer because of the increase in its equity interest in Inspilearn. *See In re Worcester Quality Foods, Inc.*, 152 B.R. 394, 404 (Bankr. D. Mass. 1993) (finding 100% equity owners to be real beneficiaries of fraudulent transfers). Debtor next argues that the value of this benefit to T&L is quantifiable—it is the value of the transferred LP Interest, which Defendants state is $540,647,109.29.[88] Finally, Debtor argues that T&L's access to, and actual control over, the LP Interest was evinced by its (fulfilled) direction to Ravindran to transfer the LP Interest *from* Inspilearn to a "non-US trust" of Inspilearn.[89]

T&L has offered no evidence to contradict the evidence on which Debtor relies. Nor has it made any substantive argument as to why T&L should not be considered the entity for whose benefit the Second Transfer was made. Accordingly, I reject T&L's argument that it is not a proper party under Section 550(a) of the Code.

---

[87] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 22:3-7; *id.* Ex. 38 (Amended & Restated LLC Operating Agreement of Inspilearn) at 7 (listing T&L's "Percentage Interest" in Inspilearn as "100%" and T&L as the sole member in Inspilearn).

[88] Finestone Decl. Ex 28 (Apex Statement); Finestone Decl. Ex. 20 (Camshaft Interrogatory Answers) at 5; Ravindran Answer ¶ 104; Finestone Decl. Ex. 7 (Morton Deposition) at 83, 135 (LP interest recorded in Camshaft's books at $538 million).

[89] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 59:18-21 (Ravindran "just took direction from the parent company," T&L, with respect to the Third Fraudulent Transfer).

T&L makes no argument regarding the merits of Debtor's claim in Count I that the Second Transfer constitutes an actual fraudulent transfer.   The Debtor has put forth both direct and circumstantial evidence of fraudulent intent with respect to the Second Transfer.

As direct evidence that the Second Transfer was made with fraudulent intent the Debtor points to (1) the statement made by Riju Ravindran's counsel that the transfer was "based on fear of lenders acting expeditiously" and that "Byju's felt the need to protect the cash;"[90] and (2) the admission of T&L founder and CEO, Byju Raveendran, that "the money is someplace the Lenders will never find it."[91]   In support, Debtor cites to *Kirschner v. Citigroup Glob. Mkts., Inc. (In re Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 161 (2d Cir. 2021) ("[F]or an intentional fraudulent transfer claim, which requires actual intent, a company's intent may be established only through the actual intent of the individuals in a position to control the disposition of [the transferor's] property.") (citations omitted) and *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, 2023 Bankr. LEXIS 2584, at *26 (Bankr. D. Del. Oct. 19, 2023) ("[I]n the fraudulent conveyance context, so long as a corporation's agent had the requisite fraudulent intent when it caused the corporation to carry out the transaction, that intent is imputed to the corporation.").

As circumstantial evidence of fraudulent intent, Debtor points to the presence of eight badges of fraud:

- **The Second Transfer was made to an insider.**   The Debtor (a T&L subsidiary) transferred the LP Interest to Inspilearn (another T&L subsidiary).[92]   *See Mallinckrodt*, 2024 WL 206682, at *27 ("[T]ransfers to an affiliate are deemed

---

[90] Finestone Decl. Ex. 30 (May 18 Transcript in Delaware Action) at 34-35.
[91] Spencer Declaration ¶¶ 11-15.
[92] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) at 22; Ex 7 (Morton Deposition) at 88-90, 97, 25 (Transfer Agreement).

transfers to insiders.").  Ravindran himself viewed the transfers as "all within the BYJU's enterprise."[93]

- **Ravindran and T&L retained control of the LP Interest.**  Ravindran was the "sole governor" of Inspilearn.[94]  Thus, post-transfer he (and, in turn, T&L) retained control of the LP Interest. *See Dealer Comput. Servs., Inc. v. Trebour*, 2013 WL 6047508, at *3 (D.N.J. Nov. 12, 2013) (debtor-transferor's president stood on both sides of transfer, so "the debtor retained control of the property after the transfer"); *MarketXT*, 376 B.R. at 412 (that funds were transferred between entities controlled by the debtor's owner and operator was a badge of fraud).

- **The fact of the Second Transfer was concealed.**  After concealing the First Transfer, Defendants then proceeded to conceal the details of the Second Transfer for almost a year.[95]

- **The Debtor made the Second Transfer directly after the Debtor's creditors exercised remedies.**[96]

- **The Debtor transferred "substantially all" of its assets.**  On March 31, 2023, the Debtor ended the day with approximately $493,905 in cash in its accounts, with no other assets or sources of revenue.[97]

- **The transferred assets were concealed.**  Defendants concealed the whereabouts of the Alpha Funds on multiple occasions.  They (i) failed to furnish financial statements that would have revealed where the Alpha Funds were transferred, (ii) refused GLAS's and the Lenders' basic information requests, (iii) made additional transfers when Plaintiffs came close to finding the Alpha Funds, (iv) orchestrated the sham resignation of Ravindran to facilitate the Fourth Transfer, and (v) repeatedly violated the Court's discovery orders, all to keep the Alpha Funds away from the Debtor and its creditors.[98]

- **The Debtor made the transfer shortly after incurring substantial debt.**  The Debtor's former management began preparations to move the LP Interest as soon as they agreed that four "Specified Defaults" had occurred (*i.e.*, October 2022), *then* conceded the maturation of four Events of Default, *and finally* moved the LP

---

[93] Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 48:15-49:11.

[94] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 32:24-33:1.

[95] Pohl Decl. ¶¶ 11,38, 39, 40; Ravindran SAC Answer ¶ 130-33; Finestone Decl. Ex. 18 (T&L Quarterly Financial Statement) and Ex. 31.

[96] Pohl Decl.; Finestone Decl. Ex 25 (Transfer Agreement), Ex. 7 (Morton Deposition); Ex. 26 (Mar. 6 Email).

[97] Pohl Decl. ¶ 30; Finestone Decl. Ex. 2 (Mar. 14, 2024 Hearing Tr.) at 54.

[98] See generally Pohl Decl., Finestone Decl.

Interest to Inspilearn on March 31, 2023, after the Lenders exercised remedies, including directing GLAS to take control of the Debtor and its assets.[99]

Lastly, Debtor argues that in addition to the overwhelming direct and circumstantial evidence of "badges of fraud," the Court may infer actual fraudulent intent where the "natural consequence" of a debtor's action is to "hinder, delay, or defraud" creditors. *See In re Tronox Inc.,* 503 B.R. 239, 279-80 (Bankr. S.D.N.Y. 2013) (observing that "actual intent" is satisfied when the consequences of an act are substantially certain to result from it); *SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*, 2016 Bankr. LEXIS 988, at *19 (Bankr. D. Del. Feb. 8, 2016) (transferors are "presumed to intend the natural consequences of their acts"). Here, Debtor argues, transferring the LP Interest to Inspilearn— which was not a guarantor or pledgor under the Credit Agreement—had the natural consequence of hindering, delaying, or defrauding the Lenders, who no longer had recourse to that value, thus undermining their economic and contractual rights.

Having considered the evidence presented by Debtor, and the lack of any opposing evidence from T&L, I am satisfied that Debtor has established that the Second Transfer was made with fraudulent intent. T&L has not pointed to any evidence that would support the conclusion that the Second Transfer was made for a proper purpose and the totality of the circumstances suggest that it was not. Accordingly, the Motion with respect to Count I and the Second Transfer, as against T&L, is granted.[100]

---

[99] *See* Debtor's Opening Brief ¶¶ 34-39.

[100] Debtor also moves for summary judgment on its constructive fraud claims against Inspilearn and T&L. Since I find in Debtor's favor on the actual fraudulent transfer claim, there is no need to rule on the constructive fraud claim.

## V.        Fiduciary Duty (Count IV)

Debtor next moves for summary judgment on Count IV of the Complaint, which asserts a

claim for breach of fiduciary duty against Ravindran arising out of his abdication of all decision-

making to the Debtor's parent, T&L.  Debtor argues that this dereliction of duty by Ravindran

constitutes both a breach of the duty of care and the duty of good faith.  To succeed on a claim

for breach of fiduciary duty, a plaintiff must demonstrate that: (1) a fiduciary duty exists; and (2)

that the fiduciary breached that duty. *In re Tropicana Ent., LLC*, 520 B.R. 455, 470 (Bankr. D.

Del. 2014) (quoting *York Linings v. Roach*, No. 16622, 1999 Del. Ch. LEXIS 160, 1999 WL

608850, *2 (Del. Ch. July 28, 1999)).

Fiduciary duties include the duties of care, loyalty, and good faith.  *In re USA Detergents,*

*Inc.*, 418 B.R. 533, 543 (Bankr. D. Del. 2009) (citing *Malone v. Brincat*, 722 A.2d 5, 10 (Del.

1998)).  "Under Delaware law, the duty of care is the duty to act on an informed basis."

*Buchwald Cap. Advisors LLC v. Schoen (In re OPP Liquidating Co.)*, Nos. 19-10729 (MFW),

21-50431 (MFW), 2022 Bankr. LEXIS 651, at *18-19 (Bankr. D. Del. Mar. 14, 2022).  "The

duty of loyalty mandates that a corporate fiduciary act with 'undivided and unselfish loyalty to

the corporation' and that 'there shall be no conflict between duty and self-interest.'"  *Official*

*Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway*

*Games Inc.)*, 428 B.R. 303, 318 (Bankr. D. Del. 2010) (quoting *Weinberger v. UOP, Inc.*, 457

A.2d 701 (Del. 1983)).  "As a subsidiary element of the duty of loyalty, a successful claim for

the breach of the duty of good faith requires a plaintiff to demonstrate one of three actions: '1)

where the fiduciary intentionally acts with a purpose other than that of advancing the best

interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable

positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act,

demonstrating a conscious disregard for his duties.'" *Id.* (quoting *In re Walt Disney Co. Derivative Litig*., 906 A.2d 27, 67 (Del. 2006)).

In support of its claim that Ravindran breached his fiduciary duties with respect to the First Transfer, Debtor points to Ravindran's testimony that he conducted no diligence of either Camshaft or Mr. Morton and asked no questions about the Debtor's transfer of more than $500 million to Camshaft.[101]  With respect to the Second Transfer, Debtor points to Ravindran's facilitation of the Debtor's transfer of the LP Interest – then valued by the Defendants at $540 million -- to Inspilearn, solely because T&L directed it.[102]  Although he sat on T&L's board, Ravindran "didn't know the reason why [he was] signing documents to move assets from BYJU's Alpha to Inspilearn[,]"[103] and did not ask why the LP Interest was being transferred or about the impact it would have on the Debtor's finances or solvency.[104]  Instead, once he got an "instruction" from T&L, Ravindran just "signed and mov[ed] on[.]"[105]

Ravindran does not oppose the merits of Debtor's claim but instead argues that the claim is technically improper for two reasons, both of which turn on the Debtor's ability to establish its insolvency at the time of the Transfers.[106]

---

[101] Finestone Decl. Ex 2 (March 14, 2024 Hearing Transcript) at 20, 42, 49 (testifying that T&L made the decision to transfer funds to Camshaft and he simply took instruction and signed documents without question), Ex. 17 (Ravindran Deposition Transcript) at 144, 280-84.  Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 112:14-19.  He had "no idea" how Camshaft was selected, and "no idea" why T&L "made that direction to [him] to invest the money in Camshaft[.]"  Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 20:18-22, 43:6-10, 43:19-44:4.

[102] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 25:1-3, 51:8-52:6.

[103] *Id.* 52:7-16, 53:16-19.

[104] *Id.* 25:4-14. He did not "wonder why we were doing this," and "[didn't] think too much about this one."  Finestone Decl. Ex. 17 (Mar. 12, 2024 Ravindran Dep. Tr.) 161:6-14.

[105] Finestone Decl. Ex. 2 (Mar. 14, 2024 Hr'g Tr.) 25:4-14.

[106] Ravindran also opposes the Motion as premature because he believes discovery is needed and because several orders were on appeal at the time briefing on this Motion was filed. As I have disposed of both issues above, I need not address them here.

First, Ravindran argues that unless Debtor establishes that it was insolvent – a fact Ravindran asserts is in dispute – he only owed fiduciary duties to the Debtor's parent company. In support, Ravindran cites to *Scher v. Essar Glob. Fund Ltd. (In re Essar Steel Minn. LLC & Esml Holdings, Inc.)*, 602 B.R. 600, 607- 08 (Bankr. D. Del. 2019) ("In general, directors of a wholly-owned subsidiary owe fiduciary duties only to the parent corporation. As the company enters the zone of insolvency, however, those directors also owe fiduciary duties to creditors of the subsidiary.") (internal citation omitted). Ravindran argues that there are genuine issues of material fact on the question of Debtor's insolvency at the time of the First Transfer, pointing to the Debtor's acknowledgement of the fact that the LP Interest obtained in exchange for the Alpha Funds was valued by Camshaft's advisors at $540 million as of March 31, 2023.[107] I disagree.

The evidence on which Ravindran relies values the LP Interest as of March 2023. This does nothing to establish the value of the LP Interest at the time of the First Transfer, which was in mid-2022. But even assuming the LP Interest did have a value of $540 million at the time of the First Transfer, the Debtor's balance sheet would still have reflected only about $671 million in assets against approximately $1.2 billion in debt.[108] At the time of the Second Transfer, the Debtor's balance sheet would have shown only $540.5 million in assets (assuming the LP Interest was valued at $540 million) against the same $1.2 billion in debt.[109] Thus, at either point in time, this meets the definition for insolvency under the Code. *See* 11 U.S.C. § 101(32)(A) (defining "insolvent" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation"). *See also Mellon Bank, N.A. v.*

---

[107] Ravindran Objection at 18; Debtor's Opening Brief at ¶¶ 14 and 46.
[108] Pohl Decl. at ¶ 30 (stating the Debtor had approximately $131 million in its bank accounts on July 13, 2022).
[109] *Id.* (stating the Debtor had $493,905.47 in its bank accounts as of March 31, 2023).

*Official Comm. Of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 154-55 (3d Cir. 1996) ("This is known as the balance sheet test: assets and liabilities are tallied *at fair valuation* to determine whether the corporation's debts exceed its assets.) (citations omitted). Ravindran has not demonstrated a genuine issue of material fact with respect to the Debtor's insolvency.

Ravindran's second argument fares no better. Ravindran argues that Debtor cannot hold him liable for breach of fiduciary duty because the Debtor's certificate of incorporation contains an exculpatory provision that provides "[t]he personal liability of the directors to this corporation or its stockholders for monetary damages for any breach of a fiduciary duty as a director shall be eliminated to the fullest extent permitted under applicable law."[110] But Ravindran's only argument on this point is that "Ravindran did not breach his duty of good faith when following the direction of [T&L] <u>unless the Debtor was insolvent</u> – which is a disputed issue of fact[.][111] As I have just explained, the Debtor's insolvency is not a disputed issue of fact.

Ravindran does not argue that the conduct at issue is conduct covered by the exculpation clause and I find that it is not. *See McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (holding that "the intentional dereliction of duty or the conscious disregard for one's responsibilities" is a "non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith"). Having considered the evidence in the record regarding Ravindran's total abdication of his duties to the Debtor,[112] as well as the absence of any evidence to the contrary, I find that Debtor has established as a matter of law that Ravindran breached his duty of good

---

[110] Finestone Decl., Ex. 1 (Certificate of Incorporation) at Art. VI.A.
[111] Ravindran Objection at 20.
[112] *See, e.g.,* Finestone Decl. Ex. 17 (Ravindran Deposition) at 112, 144, 280-284; *id.* Ex. 2 (Mar. 14, 2024 Hr'g Tr.) at 20, 24-25, 32-33, 42-43, 49, 51-52.

faith. *Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 428 B.R. 303, 318 (Bankr. D. Del. 2010) ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge their fiduciary obligations in good faith.").

The Motion is therefore granted with respect to Count IV of the Complaint.

## VI.    **Declaratory Judgment (Count VIII)**

Debtor next moves for summary judgment on Count VIII of the Complaint, in which it seeks declaratory judgment that the Second Transfer—and all subsequent transfers or dispositions of the Alpha Funds—were *ultra vires*, void *ab initio*, and/or otherwise without force and effect, and that the Alpha Funds are property of the estate under Section 541 of the Code.[113]

Section 541 provides that, upon a bankruptcy filing, an estate is created comprising, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Under Section 541(a)(6), the Debtor's estate includes the proceeds or profits of or from the property of the estate. 11 U.S.C. § 541(a)(6); *see also In re Michener*, 342 B.R. 428, 432 (Bankr. D. Del. 2006) (noting that the broad scope of "proceeds" in Section 546(a)(6), which "encompass[es] any conversion in the form of property of the estate, and anything of value generated by property of the estate") (internal citation and quotation marks omitted).

---

[113] The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration[.]" Whether a declaratory judgment action is ripe is guided by three main considerations: (i) adversity of the parties' interest, (ii) conclusiveness of the judgement; and (iii) the practical utility of the judgment. *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643 646 (3d Cir. 1990); *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995); *Wayne Land and Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 522 (3d Cir. 2018).

The basis for Debtor's claim is that the transfer of the LP Interest is void because it was done by unauthorized individuals for no consideration.  *See Solomon v. Armstrong*, 747 A.2d 1098, 1114 & n.45 (Del. Ch. 1999); *Linkerhof v. Delaware Soc. For Prevention of Cruelty to Animals*, 2012 WL 769603, at *4 (D. Del. Mar. 9, 2012) (acts taken by board fraudulently and/or in bad faith are void); *Adams v. Calvarese Farms Maintenance Corp., Inc.*, 2010 WL 3944961, at *8 (Del. Ch. Sept. 17, 2010) (noting that void acts include those that are *ultra vires*, fraudulent, or corporate waste).  In support of its claim, Debtor points to the fact that the individuals who directed the Second Transfer – Byju Raveendran and Ravindran – had no authority to act on behalf of the Debtor.  Raveendran, the CEO and founder of T&L, was not employed by the Debtor in any capacity, and Ravindran, the Debtor's former director and officer, had been removed from his positions with the Debtor several weeks before the transfer was made.[114]  Further, Debtor points to evidence that establishes that the Debtor received nothing in exchange for the transfer of the LP Interest.[115]

None of the moving Defendants cite to any evidence that would contradict these facts. T&L and Ravindran merely argue that the Court should defer issuing a ruling until all appeals in this and related actions have been resolved, an argument that I dispose of above.  Judgment against T&L and Ravindran is therefore appropriate.

Camshaft reiterates the argument made in its motion to dismiss that it is not a proper party to this claim because it has not asserted any interest in the LP Interest that was the subject

---

[114] On March 3, 2023, GLAS, on behalf of the Lenders, exercised remedies under the Term Loans and took control of the Debtor.  Pohl Declaration ¶¶ 18-19.  On that same date, GLAS removed Ravindran as director and appointed Pohl in his place.  *Id.* ¶¶ 2-4, 20.  Pohl then executed a written consent removing Ravindran as officer and appointing himself CEO.  *Id.*  On March 31, 2023, T&L directed Ravindran to transfer the LP Interest to Inspilearn.  Finestone Decl. Ex 25 (March 31, 2023 Transfer Agreement) and Ex. 7 (Morton Deposition Tr.) and Ex. 2 (Mar. 14, 2024 Hearing Tr.) 24-25, 31, 51-52 (Ravindran testifying).
[115] Finestone Decl. Ex. 7 (Morton Deposition Tr.) at 78-79, 85, 126-27.

of the Second Transfer and therefore there is no "controversy" between Camshaft and the Debtor that warrants a declaratory judgment.  Camshaft cites to no facts in the record and no caselaw to support its position. The Debtor responds that Camshaft plainly has an interest in the disposition of limited partnership interests in the Camshaft Fund, and that Camshaft was a "necessary and indispensable party" that affirmatively consented to the transfer, citing the Transfer Agreement and Subscription Agreement to support this contention.

I agree with the Debtor. That Camshaft is not asserting an interest at this time does not change the fact that Camshaft does have a legal interest in both the LP Interest itself and the transaction pursuant to which the LP Interest was transferred.  The Transfer Agreement was counter-signed by Camshaft Management, affirmatively consenting to the Debtor's transfer of the LP Interest to Inspilearn. The subscription agreement by its plain terms requires the prior written consent of Camshaft Advisors for any transfer or assignment of the limited partnership interests. Camshaft Management allowed Inspilearn to become a substitute limited partner in the Camshaft Fund with capital contribution equal to "100% of Byju's Alpha Inc.'s LP Interests." This interest is sufficient to make Camshaft a proper party against whom declaratory judgment may be entered.

For these reasons, Debtor's Motion with respect to Count VIII is granted.

## VII.    Conversion (Count X)

Lastly, the Debtor moves for summary judgment on Count X of the Complaint, in which it asserts a claim for conversion against Ravindran and T&L arising out of the Debtor's transfer of the LP Interest without corporate authority.

Conversion is generally defined as "any distinct act of dominion wrongfully asserted over the property of another, in denial of his right, or inconsistent with it."  *Malca v. Rappi, Inc.*, 2021

WL 2044268, at *5 (Del. Ch. May 20, 2021) (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)). The elements of conversion under Delaware law are: (i) the plaintiff had a property interest in the property; (ii) the plaintiff had a right to possess the property; and (iii) the defendants wrongfully possessed or disposed of the property as if it were their own. *Id.* at *5.

In support of its claim, Debtor points to the same evidence on which it relied for its declaratory judgment claim in Count VIII, showing that Ravindran, at T&L's direction, transferred the LP Interest to Inspilearn even though he had been removed from his positions as Debtor's director and officer several weeks earlier and therefore lacked legal authority to do so.[116] *See Gulf Aviation Services Group WLL v. Wilmington Trust Company*, 2023 WL 9118772, at *11 (Del. Super. 2023) (when a defendant held title to property solely in its capacity as owner trustee, its legal authority to sell that property terminated when it resigned as trustee).

Defendants do not dispute these facts, but instead simply repeat their argument that the Motion is premature. As discussed above, I reject those arguments.

The evidence makes clear that as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor. Because T&L and Ravindran lacked corporate authority to exercise control over the Debtor's property on March 31 the transfer of the LP Interest was a wrongful disposition of the Debtor's property. This constitutes conversion under applicable law. *See Gulf Aviation Servs. Grp. WLL v. Wilmington Tr. Co.*, No. N20C-05-128 AML CCLD, 2023 Del. Super. LEXIS 966, at *34 (Super. Ct. Dec. 29, 2023) ("Property is converted when the defendant wrongfully exerts dominion or control over it in a manner that denies or is inconsistent with the plaintiff's right.").

Accordingly, the Motion with respect to Count X is granted.

---

[116] *See supra*, Section VI.

**CONCLUSION**

For the reasons set forth above, the Motion is GRANTED and summary judgment will therefore be entered on Count I (with respect to the First Transfer) against Camshaft, Count I (with respect to the Second Transfer) against Inspilearn and T&L, Count IV against Ravindran, Count VIII against all defendants, and Count X against Ravindran and T&L.

The parties should submit a joint proposed order under certification of counsel. If unable to agree on the amount of the judgment, the parties should meet and confer regarding a briefing schedule and dates for an evidentiary hearing on the issue of damages.

Dated: February 27, 2025

JOHN T. DORSEY, U.S.B.J.